**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

MARION TOBACCO AND VAPE LLC, et al.,

Plaintiffs,

v. CIVIL ACTION NO. 2:26-cv-00438

FREDRIC L. WOOTON, *in his official capacity as Commissioner of the West Virginia Alcohol Beverage Control Administration*,

Defendant.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction* (Document 5), the *Plaintiffs' Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction* (Document 7), the *Defendant's Response in Opposition to Motion for Temporary Restraining Order and Preliminary Injunction* (Document 12), and the *Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction* (Document 15), as well as the *Complaint* (Document 1) and all relevant documents. For the reasons stated herein, the Court finds that the motion should be granted as to certain claims.

## FACTUAL BACKGROUND

The Plaintiffs, various West Virginia businesses and individuals associated with selling vape products,[1] initiated this action on July 2, 2026. They named as the Defendant, Fredric L.

[1] The Plaintiffs are Marion Tobacco and Vape LLC; White Hall Smoke Shop LLC; Galaxy Smokes LLC; Kimo Tobacco Vape LLC; Atlantic Vapor Hut LLC; Martinsburg Tobacco & Cigar LLC; Wild Star LLC; Wheeling Vapor

Wooton, who is the Commissioner of the West Virginia Alcohol Beverage Control Administration ("WVABCA"). The Plaintiffs challenge the constitutionality of the West Virginia Vape Safety Act,[2] W. Va. Code § 16-9H-1 *et seq.*, and the accompanying emergency legislative rule, 175 C.S.R. § 12, which impose new requirements as it relates to the sale of vape products in West Virginia.

On April 1, 2026, West Virginia enacted H.B. 5437, also known as the Vape Safety Act, establishing licensing and operational requirements for "vape or smoke shops." *See* W. Va. Code § 16-9H-1 *et seq.* Specifically, the Act provides that "[a] person, firm, or corporation shall not operate as a vape or smoke shop in or on any premises in the state without first obtaining a license issued by the commissioner pursuant to this article."[3] *Id.* at § 16-9H-3(a). Before an applicant can be issued a vape or smoke shop license, the Act requires an applicant to satisfy several requirements and undergo a background check. *See id.* at § 16-9H-5(a). One such requirement is that applicants must be "a United States citizen and a person of good character, honesty, and integrity."[4] *Id.* at § 16-9H-5(a)(1). The Act imposes criminal penalties for any person who operates a vape or smoke shop without a license, providing that such conduct shall constitute a

---

Plus LLC; Morgantown Smokers & Vape LLC; Mr Le Tobacco & Vape LLC; Morgantown Dream Smokers LLC; Happy Smoke Vape LLC; Happy Smoke Cigar LLC; Super Smoke LLC; Tri State Smoke Shop LLC; King Smokers LLC; Smoke Shop & Beauty LLC; Smokers Club LLC; Morgantown Tobacco & Vape LLC; Love Smoker LLC; Smokers Freedom LLC; SZ Tobacco & Vape LLC; Shabibi Tobacco and Vape LLC; Zak Tobacco and Vape LLC; Puff Cloud LLC; Smokers More LLC; Self Service Moke Shop, LLC; Glass Lab VIP, LLC; Patriot Smoke Shop LLC; Vaporize Smoke Shop LLC; WV Smoke Shop LLC; Salah Ahmed Qasem Hasan; Naseem Hasan; Omar Lutf; and Plant Cribs LLC, d/b/a Blue Ridge Extractions.

[2] The Act is also referred to as the Vape and Smoke Retailer Location and Operating Requirements Act. *See* W. Va. Code § 16-9H-1.

[3] The Act imposes a $1,200 fee for vape or smoke shop licenses and is effective for a period of July 1 through June 30 of the subsequent year, with the exception that those licenses issued after January 1 will be effective until June 30 of the same year and will cost $600. *See* W. Va. Code §§ 16-9H-6(a), (b); W. Va. Code R. § 175-12-3.4.1.

[4] The WVABCA's application materials require applicants to list the citizenship status of any owner, officer, and manager, and states: "IF NATURALIZED U.S. CITIZEN, MUST SUBMIT COPY OF NATURALIZATION DOCUMENTS. ALL APPLICANTS MUST BE US CITIZENS." (Document 1-1, Exhibit 4.)

misdemeanor offense punishable by a fine of not more than $10,000 and imprisonment of not more than one year.[5] *Id.* at § 16-9H-3(b).

In addition to the licensing requirement, the Act imposes a location restriction, requiring a vape or smoke retailer to "be located at least 300 feet from a church, school, or daycare center," and provides that the "distance is to be calculated by measuring a straight line from the entrance to the property line of the nearest place in question."[6] *Id.* at § 16-9H-10(c). Further, the Act restricts the ability of vape or smoke shops to "conduct advertising or promotional activities," with the exception that they may display an 18x18 exterior sign that meets certain specifications.[7] *Id.* at § 16-9H-10(b). The Act also imposes certain labeling requirements on vapor products.[8] *See id.* at § 16-9H-10(a). The Act became effective on June 11, 2026, apart from the labeling and

[5] The Act also imposes "a civil penalty of $100 per day for each vapor product offered for sale in violation of" the Act. W. Va. Code § 16-9H-11(a)(1); *see also* W. Va. Code R. § 175-12-5.

[6] The WVABCA's application materials provide that the applicant "MUST BE LOCATED AT LEAST 300 FEET FROM A CHURCH, SCHOOL OR DAYCARE, CALCULATED BY MEASURING A STRAIGHT LINE FROM THE VAPE AND SMOKE SHOP ENTRANCE TO THE PROPERTY LINE OF LOCATIONS 'A' THROUGH 'C' LISTED ABOVE." (Document 1-1, Exhibit 4.)

[7] The Act requires any exterior sign to "be affixed in one location on the outside of the licensed retail location," have a font of Helvetica or Ariel not exceeding "three inches in height or width per character," and further permits the sign to be double sided and illuminated, with the exception that it "not have a flashing light or intermittent light." W. Va. Code § 16-9H-10(b).

[8] These labeling requirements under § 16-9H-10(a) prohibit the sale of vape products that include labels and packaging depicting or referencing candy, bubble gum, cotton candy, gummy bear, gummy worm, lollipop, or any variations of those terms, as well as "cartoons, cartoon characters, superheroes, television shows, video games, movies, or other similar characters or references." W. Va. Code § 16-9H-10(a). It further prohibits any vape products that include labeling or packaging referencing or utilizing trademarks or imagery of "food brands or products that have been primarily marketed to minors such as brands of breakfast cereals, cookies, juice drinks, soft drinks, ice creams, and frozen pops," as well as trademarks or imagery of "school supplies such as USB drives or highlighters, smart phones or smart watches, headphones, any item of clothing, any toy, video game devices, or phone app integration features." *Id.* Additionally, pursuant to § 16-9H-14, the Commissioner promulgated a rule requiring vapor product labels to include "[a] warning of the potential harmful effects of the vapor product," that a person must be at least 21 years of age to purchase a vapor product, a "prohibition against selling or furnishing, by purchase, gift, or other means, the vapor product to a minor," "[a] warning to keep the vapor products away from minors," "[a] disclosure of the common or usual names of each ingredient used in the manufacture of such product," and "[t]he name, physical address, website, and principal mailing address of the manufacturer or the person responsible for distributing such product." W. Va. Code R. § 175-12-3.4.4.c.

advertising requirements under §§ 16-9H-10(a), and (b), which do not take effect until March 1, 2027, and July 1, 2027, respectively.[9]

These requirements, however, do not apply[10] to "vape or smoke retailers" that do not qualify as a "vape or smoke shop."[11] The Act defines "vape or smoke retailer" as "a retail establishment that sells tobacco products and accessories, as well as tobacco-derived and alternative nicotine products or vapor products and accessories." *Id.* at § 16-9H-2. A "vape or smoke shop" is defined as "a vape or smoke retailer that devotes at least 33 percent of its floor space to selling tobacco products and accessories, as well as tobacco-derived and alternative nicotine products or vapor products and accessories." *Id.* On June 22, 2026, the WVABCA proposed emergency legislative rules related to § 16-9H-1 *et seq.*, which were subsequently approved on June 23, 2026, by the West Virginia Secretary of State and became effective on that date. Beside clarifying the standards for the licensing and operation of vape or smoke shops, see W. Va. Code R. §§ 175-12-3, 175-12-4, the emergency legislative rule defined certain terms,

---

[9] These labeling and advertising requirements carry criminal penalties for noncompliance. Specifically, the Act provides that "[a] retailer who commits an act in violation of § 16-9H-10 of this code and the labeling requirements of this article shall be guilty of a misdemeanor and upon conviction thereof, shall be fined not less than $1,000 or confined in jail not more than one year." W. Va. Code § 16-9H-15(c). The Act also provides increased penalties for subsequent violations, providing that a retailer who commits a second violation will be guilty of a felony punishable by a fine of not less than $5,000 and imprisonment of not more than two years, that a retailer who commits a third violation will be guilty of a felony punishable by a fine of not less than $10,000 and imprisonment of not more than three years, and that for each subsequent conviction thereafter, a retailer will be guilty of a felony punishable by a fine of not more than $100,000 and imprisoned not less than 10 years. *Id.* The Court, however, notes that there appears to be some inconsistencies as it relates to these criminal penalties because the Act also provides that "any manufacturer, distributer, wholesaler, or vape or smoke retailer that sells vapor products in this state in violation of the provisions of § 16-9H-10(a) or § 16-9H-14 of this code shall be guilty of a misdemeanor for each violation." *Id.* at § 16-9H-11(a)(2).

[10] The Act further provides that it "does not apply to a cigar store. . . that does not sell vapor products." W. Va. Code § 16-9H-17.

[11] The Court notes that the advertising and location requirements under §§ 16-9H-10(b) and (c) refer to "vape or smoke retailers." However, there are some indications that the West Virginia Legislature intended these provisions to apply only to vape or smoke shops. For purpose of ruling on this preliminary injunction, the Court assumes, without deciding, that these provisions apply only to vape or smoke shops given that this Court's ruling does not necessarily depend on whether such provisions apply to vape or smoke retailers or only vape or smoke shops.

including "tobacco products"[12] and "tobacco products and accessories,"[13] and established calculations for determining which vape or smoke retailers qualify as vape or smoke shops.[14] *See* W. Va. Code R. § 175-12-2.

The Plaintiffs who operate shops that sell vape products have been identified by the WVABCA as potentially being subject to the Vape Safety Act and its licensing requirements, advising them that "[q]ualifying Vape or Smoke Shops must be licensed before July 1, 2026, for the 2026-2027 license period," and that failure to obtain a license will subject them "to criminal and civil penalties." (Document 1-1, Exhibit 3.) Individual Plaintiffs Naseem Hasan and Omar Lutf,[15] who are both owners of their respective vape shop businesses, are noncitizens and "are lawfully present in the United States and authorized by the federal government to reside and work in the United States." (Compl. at ¶ 99.) Given their status as noncitizens, the Vape Safety Act's citizenship requirement threatens to exclude them from obtaining a license, and therefore threatens their ability to continue owning, operating, and managing a vape shop. The "Plaintiffs have received notices, application materials, guidance documents, warnings, and implementation directives from WVABCA concerning the Act and face a credible threat of administrative, civil, and criminal enforcement." (*Id.* at ¶ 103) (Document 1-1, Exhibits 1-4.)

---

[12] The rule defines "tobacco products" as "any cigarette or any other tobacco or nicotine-based product." W. Va. Code R. § 175-12-2.25.

[13] The rule defines "tobacco products and accessories" as "any product used to light or ignite a tobacco product, or otherwise used in smoking of tobacco products, including, but not limited to: ashtrays, rolling papers, rolling tips, matches, lighters, butane, electronic lighters, charging cables and power blocks, glass pipes, pipes, bongs, hookahs, e-hookahs, candles, aerosols, knives, and drug paraphernalia as defined in W. Va. Code § 47-19-3." W. Va. Code R. § 175-12-2.26.

[14] The calculation established by the rule for determining total floor space devoted to tobacco products and accessories to assess if the 33 percent threshold is met involves "divid[ing] the total vape or smoke shop floor space in sub-section 2.29.2., by the total floor space calculated in 2.11., and multiply[ing] by 100." W. Va. Code R. § 175-12-2.29.3.

[15] Naseem Hasan is the owner and member of Plaintiffs King Smokers LLC and Self Service Smoke Shop, LLC, and serves as a manager for Plaintiffs Marion Tobacco and Vape LLC and White Hall Smoke Shop LLC. Omar Lutf is the owner and member of Plaintiff Super Smoke LLC.

On August 7, 2026, the Plaintiffs moved for a temporary restraining order, as well as a preliminary injunction, seeking to enjoin the enforcement of various provisions of the Vape Safety Act, W. Va. Code § 16-9H-1 *et seq.*, and the accompanying emergency legislative rule, 175 C.S.R. § 12. This Court issued an *Order* (Document 9) on August 11, 2026, granting the Plaintiffs' motion to the extent that it requested a temporary restraining order, finding that they satisfied the *Winter* factors based on the face of their motion, memorandum of law, and complaint, and enjoined the enforcement of the Vape Safety Act and its accompanying emergency legislative rule, pending this Court's ruling on the preliminary injunction.

**STANDARD OF REVIEW**

Rule 65(b)(1) of the Federal Rules of Civil Procedure provides that a temporary restraining order may be issued without notice

> only if (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). A preliminary injunction may be issued "only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The Defendant has appeared and responded in this matter.

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (internal punctuation and citations omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs must satisfy all four requirements. *JAK Prods., Inc. v. Bayer*, 616 F. App'x 94, 95 (4th Cir. 2015) (unpublished, per curiam opinion); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated,* 559 U.S. 1089 (2010), and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010). The standard requires the plaintiff "to make a clear showing of likelihood of success on the merits." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292 (4th Cir. 2011) (quotation marks omitted). However, it does not require plaintiffs to establish a certainty of success. *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020). The final two factors, "assessing the harm to the opposing party and weighing the public interest…merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

The Plaintiffs seek a preliminary injunction to enjoin the enforcement of the Vape Safety Act, W. Va. Code § 16-9H-1 *et seq.*, as well as its accompanying legislative rule, 175 C.S.R. § 12. Addressing each of the *Winter* factors, the Court finds that the Plaintiffs are entitled to a preliminary injunction as it relates to the advertising and citizenship requirements of the Act.

*A. Likelihood of Success on the Merits*

The Plaintiffs argue that various provisions of the Vape Safety Act, as well as its accompanying emergency legislative rule, violate the Equal Protection Clause, are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment, violate the First Amendment, and constitute a taking in violation of the Takings Clause.[16]

[16] The Plaintiffs do not appear to assert their Supremacy Clause claims when bringing their motion for a preliminary

Addressing each of these arguments below, the Court finds that the Plaintiffs are likely to succeed on their Equal Protection and First Amendment claims.

*(1) Equal Protection*

The Plaintiffs argue that the Vape Safety Act's citizenship requirement and its distinction between vape or smoke retailers and vape or smoke shops violate the Equal Protection Clause of the Fourteenth Amendment. Pertaining to the citizenship requirement, the Plaintiffs argue that there is no compelling interest in prohibiting noncitizens from owning, operating, managing, or otherwise participating in a vape or smoke shop, nor is the requirement "narrowly tailored" or "necessary" to achieve the purpose of the Act in protecting youth from vape products. They further argue that "[t]he Act already provides for extensive background and character checks" to ensure applicants are qualified and fit for a license, and further assert that the federal government "already conducts extensive admissibility, background, security, and work-authorization determinations before granting a noncitizen lawful permanent residence, a visa, or employment authorization." (Pls.' Mem. at 5.) They contend that the Defendant's justification does not satisfy strict scrutiny, asserting that any administrative difficulty cannot justify a categorical ban when applicants can be considered on an individualized basis. They further contend that the Defendant's justification is undermined by the record. Regarding the vape or smoke shop classification, the Plaintiffs argue that the 33 percent requirement for vape or smoke shops bears no relationship to the asserted objectives of the Act, and therefore "imposes materially different regulatory burdens upon similarly situated retailers." (*Id.* at 21.) Specifically, they argue that

injunction.

gas stations, convenience stores, and general retailers will not be subject to the licensing and operational requirements of the Act, although those same locations sell vape products.

The Defendant argues that there is a rational basis for the vape or smoke shop classification. Specifically, he argues that "a business dedicated to a particular product or service is more likely to attract customers seeking out that product or service," and that such businesses derive most of their revenue from their main product and are incentivized to maximize their customer base. (Def.'s Resp. at 11.) The Defendant asserts that as a result, vape or smoke shops are more likely to "attract vape-curious individuals (including teens and other youth)," and that "[u]nscrupulous shop owners might see youth as an untapped profit center." (*Id.*) The Defendant contends that the licensing requirement of the Vape Safety Act seeks to weed out such vape shop owners. He further contends that although the Act does not apply to all retailers, the Legislature is not required to enact comprehensive legislation and may enact legislation that aims to correct a particular problem. The Defendant argues that the citizenship requirement is precisely drawn to achieve a legitimate and substantial state interest. Specifically, he argues that the citizenship requirement is necessary given the difficulty associated with conducting background checks on noncitizens.

The Equal Protection Clause of the Fourteenth Amendment provides that: "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1. In essence, "[t]he Clause requires that similarly situated individuals be treated alike." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). "[I]f a law neither burdens a fundamental right nor targets a suspect class," then courts "will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Such legislative classifications are afforded "a strong presumption of validity," and those

challenging the classification bear the burden of "negat[ing] every conceivable basis which might support it." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). The inquiry ends "[w]here there are 'plausible reasons' for" legislative action. *Id.* at 314 (quoting *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). Nonetheless, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

However, "[c]ertain legislative classifications. . . prompt heightened review." *United States v. Skrmetti*, 605 U.S. 495, 510 (2025). For example, "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (stating that "[a]liens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate) (internal citation omitted); *see also Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (explaining that classifications based on race, alienage, or nationality "are so seldom relevant to the achievement of any legitimate state interest" and therefore will be "deemed to reflect prejudice and antipathy"). Thus, such classifications "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *Cleburne*, 473 U.S. at 440. The State bears the burden of demonstrating that its classification satisfies strict scrutiny. *Bernal v. Fainter*, 467 U.S. 216, 227 (1984); *Plyler v. Doe*, 457 U.S. 202, 217 (1982).

The Court begins with the distinction that the Vape Safety Act draws between vape or smoke shops and vape or smoke retailers. The Act imposes various licensing and operation

restrictions on vape or smoke shops but not vape or smoke retailers. *See* W. Va. Code §§ 16-9H-3–16-9H-9. The Act determines what qualifies as a vape or smoke shop by separately defining vape or smoke shop and vape or smoke retailer. A "vape or smoke retailer" according to the Act is "a retail establishment that sells tobacco products and accessories, as well as tobacco-derived and alternative nicotine products or vapor products and accessories." *Id.* at § 16-9H-2. A "vape or smoke shop" is defined as "a vape or smoke retailer that devotes at least 33 percent of its floor space to selling tobacco products and accessories, as well as tobacco-derived and alternative nicotine products or vapor products and accessories." *Id.* Given that this classification does not involve a fundamental right or a suspect class, rational basis review applies. Therefore, the Court must determine whether there is a "plausible reason" for such a classification.

An assessment of the legislative history reveals that the West Virginia legislature was concerned with the problem posed by vape or smoke shops as it relates to youth vaping. Specifically, speaking before a Senate committee hearing on March 5, 2026, Delegate David McCormick Jr., the sponsor of H.B. 5437, enacted as the Vape Safety Act, explained that "these vape shops are out of control, they need reigned in, they need regulated, and they've been preying on our children, our kids, marketing to the kids." W. Va. Sen., Hearing before the Standing Comm. on Health and Hum. Res., 87th W. Va. Leg. Reg. Sess. (Mar. 5, 2026) (statement of Del. David McCormick Jr.). He also explained during a House committee hearing on February 17, 2026, that what prompted the idea for the bill was a call he received from a constituent, who informed him of a vape shop owner texting her grandson about receiving certain vape products and selling them to him. *See* W. Va. H.D., Hearing before the Standing Comm. on Health and Hum. Res., 87th W. Va. Leg. Reg. Sess. (Feb. 17, 2026) (statement of Del. David McCormick Jr.).

During floor debate on February 27, 2026, Delegate David Cannon relayed a similar story about a vape shop establishing itself across the street from a high school and was later determined to have been selling to high school students. *See* W. Va. H.D., Floor Debate, 87th W. Va. Leg. Reg. Sess. (Feb. 27, 2026) (statement of Del. David Cannon). During the same floor debate, Delegate Wayne Clark stated that "House Bill 5437 draws a clear line, it stops smoke shops, vape shops, and companies that profit by targeting our kids and harming the next generation." *Id.* (statement of Del. Wayne Clark). Clearly, the legislative history is rife with discussion regarding the problems posed by vape or smoke shops as it relates to youth vaping.

The Plaintiffs argue that certain retailers, such as gas stations, convenience stores, and general stores, will not be subject to the licensing and operational requirements of the Act. Although it is true that the Vape Safety Act will not apply to certain retailers that do not qualify as vape or smoke shops, the legislature is "free to regulate by degree, one step at a time, 'addressing. . . the phase of the problem which seems most acute to the legislative mind.'" *Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003) (quoting *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955)). As previously indicated by the legislative history, the West Virginia Legislature viewed vape or smoke shops as more of a problem than other general retailers regarding youth vaping and decided to impose licensing and operational restrictions on them to address that problem. Thus, there is a plausible reason for the Legislature having included the vape or smoke shop classification in the Vape Safety Act and the Plaintiffs are not likely to succeed on the merits of their Equal Protection claim related to that classification.[17]

[17] The Court notes that the parties appear to raise a delegation issue under the Plaintiffs' equal protection challenge to the vape or smoke shop classification, as well as their vagueness challenge. However, given that resolving this issue is not necessary for determining whether the classification has a rational basis or whether the statute is vague, the Court does not address it.

Turning to the citizenship requirement of the Act, W. Va. Code § 16-9H-5(a)(1) provides that "[n]o vape or smoke shop license or license renewal may be granted unless. . . [t]he applicant is a United States citizen and a person of good character, honesty, and integrity." W. Va. Code § 16-9H-5(a)(1). This classification clearly discriminates against noncitizens, including those residing in the country lawfully on a valid green card, visa, or work authorization, by limiting vape or smoke shop licenses only to United States citizens, thereby restricting noncitizens' ability to own, operate, manage, or otherwise participate in a vape or smoke shop. In other words, the citizenship requirement excludes a noncitizen from obtaining a license based purely on his or her status as a noncitizen rather than based on his or her "good character, honesty, and integrity." Therefore, it should be upheld only if the Defendant demonstrates that it is "suitably tailored to serve a compelling state interest." *Cleburne*, 473 U.S. at 440; *see also Application of Griffiths*, 413 U.S. 717, 722-23 (1973) (explaining that "[i]t is appropriate that a State bear a heavy burden when it deprives [noncitizens] of employment opportunities").

The Defendant asserts that the citizenship requirement is necessary given the difficulty of conducting thorough and extensive background checks on noncitizens. He argues that "[b]y requiring licensees to be U.S. citizens, the Act ensures that ABCA can effectively 'conduct comprehensive and reliable background investigations into an applicant's moral character and community standing.'" (Def.'s Resp. at 14, quoting Document 12-1.) He also argues that "stereotypes about noncitizens are not the impetus for the Act's citizenship requirement," that WVABCA's "background checks focus on the individualized characteristics and associations of the person whose background is being investigated," and that "the citizenship requirement is aimed

at ensuring that license applicants have spent enough time in the United States such that their character, honesty, and integrity can be meaningfully assessed." (*Id.* at 14 n.15.)

The Court finds that the Defendant has failed to demonstrate the citizenship requirement is suitably tailored to serve a compelling state interest. Although the Defendant asserts that the citizenship requirement is necessary to "ensur[e] that license applicants have spent enough time in the United States" to permit "thorough and effective background checks," (Def.'s Resp. at 14 n.15, 15), this justification fails to take into account the many noncitizens who have resided in this country for many years, and for some, decades.[18] The Defendant has not explained why individualized background checks cannot be conducted for those noncitizens and why it would be difficult to do so. Even if it is the case that it may be more difficult to investigate the backgrounds of some noncitizens, a categorical ban that effectively labels all noncitizens as not having "good character, honesty, and integrity" due to that difficulty[19] is unjustifiable when individualized determinations can be made related to whether the requisite level of information required to form the basis of the background investigation is present.[20] *See Application of Griffiths*, 413 U.S. 717, 725-27 (1973) (striking down Connecticut's citizenship requirement for bar admission, finding that Connecticut failed to "establish[] that it must exclude all aliens from the practice of law in order to vindicate its undoubted interest in high professional standards" given that it had "wide freedom to gauge on a case-by-case basis the fitness of an applicant to practice law"). The citizenship requirement is neither necessary nor suitably tailored to achieve West Virginia's

[18] The justification further fails to consider that some noncitizens may never seek to become U.S. citizens, and thus, will never be eligible for a license.

[19] Although the Act does not explicitly label noncitizens as not having "good character, honesty, and integrity," by barring them from obtaining a license, and therefore, not providing them with the opportunity to demonstrate their "good character, honesty, and integrity," in effect, it essentially does.

[20] Furthermore, such a categorical ban does not even provide noncitizens with the opportunity to offer the necessary information required to form the basis of their background investigation.

interest in conducting thorough and effective background checks on license applicants for the protection of children. Importantly, the argument that WVABCA's "background checks focus on the individualized characteristics and associations of the person whose background is being investigated " is severely undercut by banning all noncitizens from being owners, operators or managers without individual assessment.

When comparing the citizenship requirement with the Act's asserted purpose, it is unclear how the citizenship requirement bears any relationship with limiting youth access to vape products. Furthermore, there are some indications that prejudice towards noncitizens may have been a basis for the citizenship requirement. For example, Delegate McCormick stated that some vape shop operators are "going to get prosecuted and possibly sent back to where they came from—we're going to get rid of this scourge," and further referenced "[f]olks that are here illegally living in these stores." Vape Shops Raided in Harrison County Under Provisions of New State Law, MetroNews (Aug. 6, 2026). Additionally, during the March 5, 2026, committee hearing, Senator Brian Helton commented that "the only people upset may be some bad actors that maybe aren't even from our country." W. Va. Sen., Hearing before the Standing Comm. on Health and Hum. Res., 87th W. Va. Leg. Reg. Sess. (Mar. 5, 2026) (statement of Sen. Brian Helton).

Based on what has been presented, the Court finds that the Defendant has failed to demonstrate that the citizenship requirement is suitably tailored to achieve a compelling state interest. Accordingly, the Plaintiffs are likely to succeed on the merits as it relates to the citizenship requirement.

*(2) Due Process—Vagueness*

The Plaintiffs contend that the Vape Safety Act is unconstitutionally vague because the Act itself does not define how the 33 percent floorspace requirement for vape or smoke shops is calculated, "nor establishes objective standards for determining what constitutes qualifying floor space." (Pls.' Mem. at 17.) They argue that as a result, "a retailer cannot determine from the statutory text alone whether it is subject to the Act's heightened regulatory scheme." (*Id.*) They concede that "[t]he emergency legislative rule supplies the methodology for calculating the statutory threshold," but argue that the rule permits the Commissioner to determine when it is "necessary" to conduct a calculation for determining if a retailer qualifies as a vape or smoke shop without establishing objective standards for determining when such calculations are "necessary." (*Id.* at 17-18.) The Plaintiffs further argue that "[t]he Commissioner. . . retains substantial discretion to determine what additional products qualify" in calculating the 33 percent threshold, asserting that the Act does not define the term "tobacco products and accessories," and that "[t]he emergency legislative rule supplies an expressly nonexclusive definition encompassing numerous items with common non-tobacco uses, including lighters, charging cables, power blocks, candles, and knives." (*Id.* at 18.)

The Defendant contends that the Vape Safety Act is far from vague. He asserts that the Act applies to "vape or smoke shops," which is defined by the Act. (Def.'s Resp. at 7.) He further asserts that the Plaintiffs concede that the emergency legislative rule supplies the methodology for calculating the 33 percent threshold. The Defendant also argues that the Legislature properly delegated rulemaking authority to the WVABCA and provided it with the 33 percent threshold to rely on when crafting the emergency legislative rule. He contends that the

emergency legislative rule provides retailers with all the information needed to determine whether they qualify as a vape or smoke shop.

The doctrine of void for vagueness, as applicable to the states, is governed by the Due Process Clause of the Fourteenth Amendment. *See Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019). This doctrine applies when a statute "fails to 'give a person of ordinary intelligence adequate notice of what conduct is prohibited' or lacks 'sufficient standards to prevent arbitrary and discriminatory enforcement.'" *Carolina Youth Action Project; D.S. by and through Ford v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023) (citing *Manning*, 930 F.3d at 272). The vagueness doctrine requires a statute to provide sufficient notice, so citizens are able to "conform their conduct to the proscriptions of the law." *Manning*, 930 F.3d at 274 (citing *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999)). A statute fails to provide sufficient notice, and therefore, is unconstitutionally vague, if it "fails to provide any standard of conduct by which persons can determine whether they are violating the statute." *Id.* The vagueness doctrine also requires a statute to provide "minimal guidelines to govern law enforcement." *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). A statute that fails to provide minimal guidelines is vague because it "impermissibly delegates basic policy matters to [enforcers] for resolution on an ad hoc and subjective basis, with attendant dangers of arbitrary and discriminatory application." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F.Supp.3d 66, 116 (D. Md. 2025) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

The Court finds that the Vape Safety Act and its accompanying emergency legislative rule are not unconstitutionally vague. Both the Act and its emergency legislative rule make clear which retailers are subject to the Act's licensing and operational restrictions. Specifically, both

the Act and the emergency legislative rule provide that "vape or smoke shops" are subject to the licensing and operation requirements, see W. Va. Code § 16-9H-3(a) and W. Va. Code R. §§ 175-12-2.29.4, 175-12-3, 175-12-4, and both define "vape or smoke shop" as "a vape or smoke retailer that devotes at least 33 percent of its floor space to selling tobacco products and accessories, as well as tobacco-derived and alternative nicotine products or vapor products and accessories." W. Va. Code § 16-9H-2; W. Va. Code R. § 175-12-2.29.

Moreover, the emergency legislative rule outlines the calculations utilized to determine which retailers meet the requisite 33 percent floor space threshold to qualify as a vape or smoke shop.[21] In particular, the percentage of floor space devoted to selling tobacco products and accessories[22] is calculated by "divid[ing] the total vape or smoke shop floor space in sub-section 2.29.2., by the total floor space calculated in 2.11., and multiply[ing] by 100." W. Va. Code R. § 175-12-2.29.3. The total floor space is first "calculated by measuring the interior proposed premises size using the interior length times interior width in feet," representing "all space in the proposed premises,"[23] and then is subtracted "by the square footage of any spaces used solely for office functions, limited video lottery, or restrooms,"[24] as well as "any empty space square footage

[21] The Plaintiffs take issue with the fact that the Act itself does not include the calculations for determining which retailers qualify as vape or smoke shops, arguing that "a retailer cannot determine from the statutory text alone whether it is subject to the Act's heightened regulatory scheme." (Pls.' Mem. at 17.) However, the fact that one must look beyond the text of the statute to get a full picture of what it covers does not render the statute unconstitutionally vague. *See United States v. Zhi Yong Guo*, 634 F.3d 1119, 1122-23 (9th Cir. 2011) (explaining that "a statute does not fail the vagueness test simply because it. . . requires that several sources be read together," but rather, "the test is whether the text of the statute and its implementing regulations, read together, give ordinary citizens fair notice with respect to what" is forbidden and "adequately provide for principled enforcement by making clear what conduct" violates the statutory scheme).

[22] The percentage also includes tobacco-derived and alternative nicotine products or vapor products and accessories. *See* W. Va. Code § 16-9H-2; W. Va. Code R. § 175-12-2.29.3

[23] This is regardless of "whether [such space is] used for retail space (such as soda, chips, or alcohol products), office, storage space, restrooms, limited video lottery, or other purposes which are included in the total interior floor space." W. Va. Code R. § 175-12-2.11.1.

[24] However, "[a]ny space (even office, lottery, or restroom space) with shared storage for tobacco products and accessories, as well as tobacco-derived products, alternative nicotine products or vapor products and accessories will

within the store that is beyond the three feet being added to counters, displays, and wall boards to establish the total interior retail floor space." *Id.* at § 175-12-2.11. The total vape or smoke shop floor space is calculated by adding together the measurements for all "[c]ounters, displays, storage, restrooms, office space, shelving, or wall boards containing mixed products that are not tobacco products and accessories, as well as tobacco-derived and alternative nicotine products or vapor products and accessories but are intermixed with such products," counters and registers with such products behind the counter or register, and "any lounge, vaping, or smoking areas."[25] *Id.* at § 175-12- 2.29.2.e. Based on the definition of "vape or smoke shop" and these calculations, both the Act and the emergency legislative rule provide more than sufficient notice and guidance as it pertains to which retailers are subject to the licensing and operational requirements.

The Plaintiffs argue that the emergency legislative rule permits the Commissioner to determine when it is "necessary" to conduct a calculation to verify that a retailer is not a vape or smoke shop, and that neither the Act or the rule outline when such calculations are "necessary," therefore "vest[ing] the Commissioner with unbounded discretion over the Act's applicability, and "invit[ing] arbitrary and discriminatory enforcement." (Pls.' Mem. at 18-19.) However, the fact that the emergency legislative rule provides the Commissioner with discretion in determining when to conduct a calculation does not necessarily mean the rule is vague. *See Schleifer by*

---

be considered as storage space for such products and kept as part of the total interior floor space." W. Va. Code R. § 175-12-2.11.2.

[25] The rule provides that this calculation "will account for all floor space, displays, counters, storage, restrooms, office space, shelving, or wall boards containing tobacco products and accessories, as well as tobacco-derived and alternative nicotine products or vapor products and accessories and measure their dimensions and square footage by adding to their length and width an additional three feet to the floor space, displays, counters, shelving, or wall boards measurements for retail patron ingress and egress as part of the vape or smoke shop floor space." W. Va. Code R. § 175-12-2.29.2.c. It further provides that "[i]f a display, counter, shelving, or wall board is within three feet of the dimensions of the premises, then the measurement will not add three feet, to either length or width as applicable, but the measurement will use the actual measurement as to either the length and the width, as applicable." *Id.*

*Schleifer v. City of Charlottesville*, 159 F.3d 843, 854 (4th Cir. 1998) (explaining that "[e]very criminal law, of course, reposes some discretion in those who must enforce it," and that "[t]he mere possibility that such discretion might be abused hardly entitles courts to strike a law down"). Some discretion was likely included in the emergency legislative rule for determining whether to conduct a calculation due to the fact that it would be impractical to require that calculations be conducted for every retail location that sells vape products, especially for those locations where viewing them alone clearly reveals that they do not meet the 33 percent floorspace threshold. The fact that the emergency legislative rule permits the Commissioner to decide when to conduct a calculation for determining which retailers qualify as vape or smoke shops does not render it unconstitutionally vague.

The Plaintiffs further argue the Act and the emergency legislative rule provide the Commissioner with substantial discretion in determining which products qualify in calculating the 33 percent threshold, asserting that the Act does not define the term "tobacco products and accessories" and "[t]he emergency legislative rule supplies an expressly nonexclusive definition encompassing numerous items with common non-tobacco uses, including lighters, charging cables, power blocks, candles, and knives." (Pls.' Mem. at 18.) However, the emergency legislative rule clearly defines "tobacco product" as "any cigarette or any other tobacco or nicotine-based product," and "tobacco products and accessories" as "any product used to light or ignite a tobacco product or otherwise used in smoking of tobacco products." W. Va. Code R. §§ 175-12-2.25, 175-12-2.26. Although a nonexclusive list is included with the definition of "tobacco products and accessories," the supplied definition provides adequate notice of what is covered and further guides enforcement. The fact that the definition of the term is accompanied by a

nonexclusive list that corresponds with that definition does not render the term unconstitutionally vague.[26] *Cf. Int'l Ass'n of Color Mfrs. v. Singh*, 814 F.Supp.3d 652, 669-71 (S.D. W. Va. 2025) (finding the term "poisonous and injurious" unconstitutionally vague given that the term was undefined *and* accompanied by a nonexclusive list of color additives not typically associated with the term, therefore failing to provide adequate notice and leaving the door open to arbitrary enforcement as to what constitutes "poisonous and injurious" due to a lack of clear criteria to guide enforcement).

After review, finding that the Vape Safety Act and its accompanying emergency legislative rule are not unconstitutionally vague, the Plaintiffs are not likely to succeed on the merits of this claim.

*(3) First Amendment*

The Plaintiffs argue that the advertising restriction § 16-9H-10(b) "prohibits all advertising and promotional activities by an entire class of lawful businesses, thereby burdening truthful commercial speech protected by the First Amendment." (Pls.' Mem. at 11.) They argue that the advertising restriction imposes content- and speaker-based burdens, and therefore is subject to heighted scrutiny, by targeting specific speakers, mainly vape or smoke retailers, and targeting particular subject matter, mainly the advertising of lawful vape and tobacco products. They contend, however, that even if the advertising restriction is subject to *Central Hudson's* test for commercial speech, the restriction still likely violates the First Amendment. The Plaintiffs assert that the advertising restriction likely fails the third and fourth factors of *Central Hudson*. Relying on *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001), they argue that the Act is substantially

[26] Although the Plaintiffs assert that some of the listed items have common non-tobacco uses, those listed items can also be associated with tobacco use.

more extensive than necessary given that it "broadly prohibits advertising and promotional activities without limiting the restriction to youth-directed, misleading, or otherwise unlawful speech." (*Id.* at 13.)

The Defendant concedes that the Plaintiffs are likely correct that the advertising restriction of the Vape Safety Act violates the First Amendment. Relying on *Lorillard Tobacco*, he asserts that while the state has an interest in regulating advertising of vape and tobacco products, "the Constitution does not permit a complete prohibition on the advertising of them" when such products remain legal. (Def.'s Resp. at 20.)

"The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980) (explaining that "[c]ommercial expression not only serves the economic interest of the speaker but also assists consumers and furthers the societal interest in the fullest possible dissemination of information"). Although commercial speech is protected under the First Amendment, the Supreme Court has distinguished between commercial speech and other forms of speech, recognizing that "[t]he Constitution. . . accords a lesser protection to commercial speech." *Id.* at 562-63; *see also Recht v. Morrisey*, 32 F.4th 398, 408 (4th Cir. 2022) (explaining that "[s]trict scrutiny is. . . improper when reviewing laws that regulate commercial speech"). The Court in *Central Hudson* adopted the following four-part test to determine whether a restriction on commercial speech is unconstitutional:

> (1) to receive any First Amendment protection, commercial speech "must concern lawful activity and not be misleading;" (2) the government must assert a "substantial" government interest to justify its regulation; (3) the regulation must "directly advance[] the governmental interest asserted;" and (4) the regulation must not be "more extensive than is necessary to serve that interest."

*WV Ass'n of Club Owners and Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 301 (4th Cir. 2009) (quoting *Cent. Hudson*, 447 U.S. 557, 566 (1980)).

Beginning with the first *Central Hudson* factor,[27] given that § 16-9H-10(b) prohibits nearly all advertisements and promotional activities by vape or smoke shops, and therefore encompasses advertisements and promotions of lawful, age-restricted products that appeal to audiences regardless of their age, such advertisements and promotions concern lawful activity. *See Educ. Media Co. at Virginia Tech, Inc. v. Swecker*, 602 F.3d 583, 589 (4th Cir. 2010) (recognizing "that advertisements for age-restricted—but otherwise lawful—products concern lawful activity where the audience comprises both underage and of-age members"). Additionally, there is no indication that West Virginia is attempting to prohibit only misleading advertisements by enacting § 16-9H-10(b). Regarding the second and third *Central Hudson* factors, it is clear that West Virginia has a substantial interest in preventing the use of vape products by minors, and the Court assumes, without deciding, that § 16-9H-10(b) directly advances that interest.

Turning to the final *Central Hudson* factor, the Supreme Court's decision in *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) is instructive. In that case, the Massachusetts Attorney General promulgated regulations that prohibited outdoor advertising of tobacco products within 1,000 feet of any school or playground to prevent the use of tobacco products by minors. *Lorillard Tobacco*, 533 U.S. at 533. The Supreme Court concluded that the restrictions were more extensive than necessary to achieve the State's substantial interest. *Id.* at 565. The Court

[27] Although the "the party seeking to uphold a restriction on commercial speech carries the burden of justifying it," *Educ. Media Co. at Virginia Tech, Inc. v. Insley*, 731 F.3d 291, 297 (4th Cir. 2013) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)), and the Defendant concedes that § 16-9H-10(b) is likely an unconstitutional restriction on commercial speech, the Court will still engage in review of § 16-9H-10(b).

found that "[i]n some geographical areas, these regulations would constitute nearly a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult consumers," and that "[t]he broad sweep of the regulations indicates that the Attorney General did not 'carefully calculat[e] the costs and benefits associated with the burden on speech imposed' by the regulations." *Id.* at 561-62 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993)). The Court further found that "the range of communications restricted seems unduly broad," explaining that regulations were not tailored to particular advertising and promotion practices that have been identified to appeal to youth. *Id.* at 563.

The Court finds that the advertising restriction under § 16-9H-10(b) is more extensive than necessary to achieve West Virginia's interest in preventing youth vaping. With the exception of an 18x18 inch exterior sign possessing certain specifications to identify a shop as a vape or smoke shop, § 16-9H-10(b) prohibits vape or smoke shops from "conduct[ing] advertising or promotional activities." W. Va. Code § 16-9H-10(b). This restriction is similar to those found in *Lorillard Tobacco* in that it would ban nearly all advertisements conveying truthful information regarding vape and tobacco products, yet it is also broader given that it does not possess a similar geographical limitation. Moreover, the advertising restriction of § 16-9H-10(b) also unduly bans a broad range of advertisements and promotions given that it is not limited to advertisements and promotions that have been found to appeal to minors. The fact that the prohibition bans nearly all forms of advertisements relating to vape and tobacco products demonstrates a lack of tailoring by the West Virginia Legislature and indicates that it did not consider the substantial burden that such a prohibition would impose on speech. The advertising restriction of § 16-9H-10(b) is more extensive than necessary, and therefore, does not satisfy the fourth *Central Hudson* factor.

Given that the advertising restriction under § 16-9H-10(b) fails under *Central Hudson's* fourth factor, the Court finds the restriction violates the First Amendment. The Plaintiffs are likely to succeed on the merits of their First Amendment claim related to § 16-9H-10(b).[28]

*(4) Takings Clause*

The Plaintiffs argue that they have leasehold interests that are protected by the Takings Clause. They contend that the Vape Safety Act's "300-foot location restriction and other challenged requirements threaten their ability to continue operating from premises subject to the long-term leases." (Pls.' Mem. at 23.) They argue that they committed to long-term lease obligations in reliance on the previous regulatory framework, as well as "acquired fixtures and inventory, invested significant capital in tenant improvements and buildouts, and developed location-dependent consumer relationships and goodwill." (*Id.* at 22.) They assert that several of the Plaintiffs' leases "contain exclusive-use or restrictive-use provisions requiring that the leased premises be used only as a vape shop, smoke shop, tobacco store, or substantially similar retail business." (*Id.*) The Plaintiffs further assert that for these Plaintiffs, "they cannot simply convert the premises to another commercial use without breaching their leases" and "remain contractually obligated to pay rent and perform all other obligations under their long-term leases." (*Id.*)

---

[28] Although the Plaintiffs also challenge the labeling restrictions under § 16-9H-10(a) in their complaint, the Court notes that the Plaintiffs did not initially assert this challenge when bringing their motion for a preliminary injunction and attempt to assert the challenge for the first time in their reply. Because the Plaintiffs asserted only a First Amendment challenge to the advertising restriction under § 16-9H-10(b) in their memorandum in support of their motion, the Defendant was under the impression that the Plaintiffs were not challenging § 16-9H-10(a) when bringing their motion for a preliminary injunction. (Def.'s Resp. at 20 n.19.) Therefore, the Court does not consider whether § 16-9H-10(a) also violates the First Amendment. *See De Simone v. VSL Pharmaceuticals, Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) (explaining that "[g]enerally, new arguments cannot be raised in a reply brief before the district court," and that district courts have discretion in determining whether to consider arguments raised for the first time in a reply) (internal quotations omitted).

The Defendant argues that a regulatory taking has not occurred. He argues that "the Vape Safety Act permits a myriad of other uses of the commercial property in question—up to and including operation as a vape retailer that dedicates less than 33% of its retail floor space to tobacco or vape products." (*Id.* at 17.) He asserts that as a result, the Plaintiffs' leaseholds have not been so diminished by enforcement of the Act. The Defendant further asserts that even under the *Penn Central* test, the Act does not amount to a regulatory taking. He argues that land use restrictions, particularly those relating to tobacco products, cannot be described as unexpected. He further argues that if it is the case that such products can be banned without running afoul of the Constitution, then "a regulatory scheme that merely limits the manner and location of such sales—while still allowing such sales to occur in a manner prescribed by law—cannot violate the Constitution." (*Id.* at 19.)

The Court finds that even if § 16-9H-10(c) amounts to a taking, the Plaintiffs are not entitled to any equitable relief related to their Takings claim. "Equitable relief is not available to enjoin an alleged taking of private property for public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984); *Knick v. Township of Scott, Pa.*, 588 U.S. 180, 201 (2019) (explaining that "the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking," and that "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking"). West Virginia permits property owners to bring an inverse condemnation action under Article III, Section 9, of the West Virginia Constitution for a writ of mandamus to recover compensation for a regulatory taking. *West Virginia Lottery v. A-1 Amusement, Inc.*, 807

S.E.2d 760, 770 (W. Va. 2017); *State ex rel. Phoenix Ins. Co. v. Ritchie*, 175 S.E.2d 428, 431 (W. Va. 1970). Because the Plaintiffs are able to file suit in state court to recover compensation for a regulatory taking, they are unable to obtain an injunction enjoining enforcement of § 16-9H-10(c). The Plaintiffs are not likely to succeed on the merits of their Takings claim.

*B. Irreparable Harm*

The Plaintiffs argue that they will suffer immediate, irreparable harm, absent an injunction. As it relates to the citizenship requirement, they argue that the "Plaintiffs whose owners, managers, or other covered individuals do not satisfy the challenged citizenship requirements face rejection, denial, or nonrenewal of licenses necessary to operate lawfully." (Pls.' Mem. at 6.) They argue that as a result, such a requirement places these Plaintiffs in a difficult position where "they must either cease or substantially curtail operations, restructure or transfer lawful ownership and management interests, terminate or remove noncitizen owners, managers, employees, or other covered individuals, or continue operating under threat of civil, criminal, administrative, and licensing penalties." (*Id.*) Citing recent enforcement measures, they assert that the harm faced is immediate and concrete given that they must have a license to lawfully operate, and without one, they "face imminent loss of business operations, ownership and management rights, employment, inventory value, leasehold value, customer relationships, goodwill, and ongoing business opportunities," which are not purely economic harms. (*Id.* at 7.) The Plaintiffs, who are lawful permanent residents, contend that they face collateral consequences from the threatened criminal penalties related to their immigration status and ability to remain in the United States. Regarding the advertising restriction, the Plaintiffs argue that the restriction will force them to refrain from engaging in constitutionally protected speech, and thus, threatens to deprive them of

their constitutional right to protected speech. They further argue that although the advertising restriction does not take effect until July 1, 2027, litigation will likely not conclude by that time, asserting that civil cases that go to trial have a median duration of 35.6 months.

The Defendant argues there is no irreparable harm arising from the advertising restriction under § 16-9H-10(b). Specifically, he asserts that such harm does not constitute irreparable harm because it is not imminent given that § 16-9H-10(b) does not go into effect until July 1, 2027, which is nearly 11 months from now.

A plaintiff seeking a preliminary injunction must demonstrate that it is likely to suffer irreparable harm in the absence of an injunction. *See Winter*, 555 U.S. at 22. "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. V. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). Harm is irreparable if it "cannot be fully rectified by the final judgment after trial." *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012).

Economic harms typically will not rise to the level of irreparable harm unless those harms are unrecoverable. *See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019); *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 Fed.Appx. 251, 263 (4th Cir. 2017). Economic harms found to rise to the level of irreparable include permanent closure of a business, loss of employees, loss of customers and good will, and loss of business relationships. *See Mountain Valley Pipeline*, 915 F.3d at 218 (explaining that "threatening a party's very existence by, for instance, driving it out of business before litigation

concludes" qualifies as irreparable harm); *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (same as it relates to loss of employees and customers); *Real Time Medical Systems, Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 239 (4th Cir. 2025) (same as it relates to "loss of good will or erosion of [a company's] customer base"); *Sogefi USA, Inc. v. Interplex Sunbelt*, Inc., 538 F.Supp.3d 620, 630 (S.D. W. Va. 2021) (finding irreparable harm as it relates to loss of business relationships).

The Court finds that the Plaintiffs will suffer irreparable harm as it relates to their Equal Protection claim and their First Amendment claim. Beginning with the First Amendment claim, as previously demonstrated, the Plaintiffs are likely to suffer a First Amendment violation once § 16-9H-10(b) goes into effect, which in and of itself, is sufficient to constitute irreparable harm. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is likely a constitutional violation, the irreparable harm factor is satisfied." (citing *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009))); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of first amendment rights constitute per se irreparable injury"). *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (explaining that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Thus, because the Plaintiffs will suffer constitutional harm, irreparable harm has been established as it relates to the First Amendment claim.

Turning to the Plaintiffs' Equal Protection claim, the noncitizen Plaintiffs stand to suffer significant, imminent harm as a result of the citizenship requirement. Those Plaintiffs also stand to suffer constitutional harm as a result of being unable to obtain a vape or smoke shop license based purely on their status as noncitizens. Again, the constitutional violation is sufficient to

establish irreparable harm. *See Leaders of a Beautiful Struggle*, 2 F.4th at 346. Additionally, being unable to obtain a license, they face loss of their business operations, possibly depriving them of their livelihood, as well as loss of employees and customers. They are further faced with criminal penalties if they continue to operate their businesses without a license. *See* W. Va. Code § 16-9H-3(b). Given that the noncitizen Plaintiffs are lawful permanent residents, the criminal penalties may carry additional collateral consequences, including consequences related to their immigration status and ability to remain in the United States.

The harm faced by the noncitizen Plaintiffs is also imminent given that the licensing requirements, which include the citizenship requirement, have already gone into effect. Additionally, the WVABCA has notified the Plaintiffs that they may be subject to such requirements, advised them they would have to obtain a license by July 1, 2026, provided them with application and guidance materials, and threatened them with administrative, civil, and criminal penalties for noncompliance. (Document 1-1, Exhibits 1-4.) The noncitizen Plaintiffs have demonstrated that they will suffer irreparable harm absent injunctive relief.

*C. Balance of Equities and Public Interest*

To be entitled to a preliminary injunction, the Plaintiffs "must finally demonstrate that the balance of equities and public interest weighs in its favor." *Asylum Seeker Advoc. Project v. United States Citizenship and Immigr. Servs.*, 808 F.Supp.3d. 708, 721 (D. Md. 2025). A preliminary injunction's primary purpose "is to maintain the status quo." *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017).

The citizenship requirement is not relevant to West Virginia's and the public's interest in preventing youth vaping. To the extent that West Virginia asserts that such requirement is

necessary for thorough and efficient background checks, any harm suffered by West Virginia relating to the difficulty of conducting background checks on noncitizen vape or smoke shop applicants is minimal when compared to the substantial harm those noncitizen Plaintiffs will face as a result of being prohibited from obtaining a vape or smoke shop license, and subsequently prohibited from owning, operating, or managing a vape or smoke shop. Similarly, the noncitizen Plaintiffs stand to face constitutional harm as a result of being excluded from obtaining a vape or smoke shop license due to their status as noncitizens. The public interest favors an injunction under these circumstances given that "it is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

Granting an injunction will not harm the WVABCA's ability to continue enforcing other aspects of the Vape Safety Act that are currently in effect given that this injunction is limited only to the advertising and citizenship requirements. Any harm suffered by West Virginia as a result of not being able to enforce the citizenship requirement will be minimal given that a person's immigration status is not relevant to limiting youth access to vape products. Additionally, West Virginia will not suffer any harm as it relates to the advertising requirement inasmuch as it has not begun enforcement of that requirement. An injunction, however, will ensure that noncitizens are not excluded from obtaining a vape or smoke shop license purely based on their status as noncitizens, allowing them to obtain one as long as they satisfy the other requirements, which in turn, will allow them to own, operate, or manage a vape or smoke shop. It also will preserve the status quo in favor of the exercise of First Amendment rights by permitting vape or smoke shops

to continue to advertise their products. The balance of equities and the public interest favor granting a preliminary injunction.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court, having found that the citizenship requirement under § 16-9H-5(a)(1) of the Vape Safety Act likely violates the Equal Protection Clause of the Fourteenth Amendment and that the Plaintiffs have satisfied the additional *Winter* factors related to that requirement, **ORDERS** that the *Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction* (Document 5) be **GRANTED** to the extent it requests a preliminary injunction. The Court **ORDERS** that the prior *Order* (Document 9) temporarily enjoining the Defendant be **VACATED**, and that the Defendant and his officers, agents, employees, successors, and all persons acting in concert and participation with the Defendant be **ENJOINED** from administering, implementing, enforcing, or otherwise giving effect to the citizenship and advertising requirements under §§ 16-9H-5(a)(1) and 16-9H-10(b) of the Vape Safety Act and any similar requirements under 175 C.S.R. § 12.[29]

Given the Court's finding regarding the absence of any meaningful harm to the Defendant related to its injunction preserving the status quo, as well as the likelihood that the Plaintiff will

---

[29] The Court finds that the citizenship and advertising requirements are severable from the rest of the statute. "The question of the severability of a state statute's provisions is governed by state law." *Sons of Confederate Veterans, Inc. ex rel. Griffon v. Commissioner of Virginia Dep't of Motor Vehicles*, 288 F.3d 610, 627 (4th Cir. 2002). Although § 16-9H-1 *et seq.* does not contain a severability clause, the West Virginia Supreme Court has adopted a fairly liberal severability analysis, explaining that "a statute. . . may contain both constitutional and unconstitutional provisions which in substance are distinct and separable so that some may stand though others must fall," regardless of "whether or not the statute in question contains a separability clause." *State ex rel. Loughry v. Tennant*, 732 S.E.2d 507, 519 (W. Va. 2012) (quoting *State ex rel. State Bldg. Comm'n v. Bailey*, 150 S.E.2d 449, 457 (W. Va. 1966)). Given that the citizenship requirement is one of several distinct requirements for a vape or smoke shop license and that the advertising requirement under § 16-9H-10(b) is separate and independent from other requirements of the Vape Safety Act, the Court finds that the citizenship and advertising requirements are severable. Therefore, this order applies only to those requirements and not other aspects of the Vape Safety Act and its accompanying emergency legislative rule.

prevail on the merits, the Court **ORDERS** that the security required by Federal Rule of Civil Procedure 65(c) be set to **ZERO**. *See, e.g.*, *Doe v. Pittsylvania Cty., Va.*, 842 F.Supp.2d 927, 937 (W.D. Va. 2012). The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: September 3, 2026

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA